Robert A. Sparks
1552 Noble Street
Fairbanks, Alaska 99701
(907) 451-0875
(907) 451-9385
sparkslawoffice@yahoo.com
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| DONNA M. HUNTER, | ) No.4:13-cv-00003-RRB |
| Plaintiff, | ) |
| vs. | ) |
| FAIRBANKS COMMUNITY MENTAL HEALTH CENTER, INC. d/b/a FAIRBANKS COMMUNITY BEHAVIORAL HEALTH CENTER, INC. | ) |
| Defendant. | ) |

## DONNA M. HUNTER AFFIDAVIT

Donna M. Hunter, being first duly sworn upon his oath, deposes and states as follows:

1.      In approximately April 2011, I submitted an application for a receptionist/front desk position with the Defendant Fairbanks Community Behavioral Health Center. I was 44 years old at the time I was hired. I am a female.

2.      Danielle Stone, Kelly Shanklin's assistant, asked me if I wanted to interview for the HR tech position that was available. I was interviewed by Kelly Shanklin and Danielle Stone for the HR tech position. I have never told Ms. Shanklin

page 1

that I had 25 years of HR-related work experience. I did tell Ms. Shanklin that I had several years of HR experience with a former employer. After the interview, Danielle Stone told me that FCBHC wanted to offer me the HR Supervisor position

3. I subsequently learned that at the time of my interview for the HR tech position that there was an employee, Krissy Hutchinson, currently employed by FCBHC in that position. I met Ms. Hutchinson only after I was hired for the HR Supervisor position. I was not told that I would be working with anyone else at the time of my interview and Ms. Hutchinson was not involved in my interview for the position. I thought that it was very unusual that I had initially been interviewed for Ms. Hutchinson's position. Ms. Hutchinson was also the only person who provided me with any training in my job as the HR Supervisor at the FCBHC.

4. When I started work, I had an office and Ms. Hutchinson had her own separate office. While I was technically Ms. Hutchinson's supervisor, I had no idea what she was working on. When I went to her office, she usually had another employee in her office that she was speaking with.

5. I informed Ms. Hutchinson that I needed to know what work she was doing on a daily basis. Ms. Hutchinson told me that my title did not mean anything to her. I had told Ms. Hutchinson that I needed to know what she was doing so that I would be able

page 2

to tell my supervisor, Ms. Shanklin, what Ms. Hutchinson was working on. Ms. Hutchinson told me that if Ms. Shanklin wanted to know what she was working on, that Ms. Shanklin could ask her about it. I was absolutely shocked by this display of insubordination by Ms. Hutchinson. I immediately went to Ms. Shanklin and told her that I intended to discipline Ms. Hutchinson for this incident. Ms. Shanklin told me not to bother, that Ms. Hutchinson had submitted her two week notice and that she was quitting.

6. My understanding from speaking with Ms. Hutchinson was that Ms. Hutchinson had received training by the former HR Assistant, Ms. Laurie Gillette, immediately prior to Ms. Gillette being terminated from her position. It was my further understanding from speaking with Ms. Hutchinson, and other employees at FCBHC, that Ms. Hutchinson had been running the FCBHC HR office by herself for several months following Ms. Gillette's termination.

7. After Ms. Hutchinson left, I asked Kelly Shanklin if she wanted me to advertised Ms. Hutchinson's position. Ms. Shanklin replied that the FCBHC did not intend to fill the HR Tech position, because there was not enough work for two people. While I strongly disagreed with Ms. Shanklin, she refused to fill the position.

8. I had no clerical support in the HR office after Ms.

page 3

Hutchinson quit. I performed all of the HR Tech duties and the day to day duties that were included in the HR Supervisor position that I had time to accomplish.

9. The HR Office was a complete mess when I started work. The only thing that I could tell that was being accomplished was that new employees were being entered into the computer system software database. There were no Standard Operating Procedures for the office that stated which reports or information needed to be prepared and how often, what reports needed to be submitted to government agencies etc. I had to work overtime to get a handle on what was going on at the office.

10. Shortly after I started work, I was informed that the HR office was being consolidated from the two existing file rooms and an office to one office. All the filing cabinets had to be relocated into my new office. It was wall to wall filing cabinets. There was not enough room for all of the file cabinets, boxes and furniture. I had to neatly stack boxes of documents on top of the filing cabinets to get everything to fit. Ms. Shanklin informed me that she did not like the way the boxes sitting on top of the file cabinets looked. Ms. Shanklin told me that I had to come in on the weekends, on my own time, to complete filing all of the documents that had been in boxes for months or years prior to my being hired into file cabinet drawers. I spent over six hours of my own time completing this

page 4

LAW OFFICES
ROBERT A. SPA
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

task on a Saturday.

11. The only constructive criticism that I had received about my work performance through the time that I received my performance evaluation in October 2011, was when Ms. Shanklin told me when I received my performance evaluation that my voice carries and that I should keep my door shut. All aspects of my work performance were rated as being completely "satisfactory" on September 26, 2011. My evaluation does not stated that I had ever done anything wrong. My evaluation told me that I was doing a good job.

12. I continued working diligently at my job. I did not receive any criticism from Ms. Shanklin or anyone else about my job performance or any other aspect of my behavior.

13. During the incident on April 5, 2012, I was in my office at work and Tammy came in. I was not on speaker phone. The phone was in my ear. Smitty had asked me, what did his friend have to do to apply for a position. I told him he had to be 25 with a clean driving record. He told me his friend's DUI is more than 10 years old and it shouldn't be on his record. And I said if it's anywhere on his record, I can't have him on the insurance. He can't drive. He says, well, it's 10 years old. I said, there's no limitation on it. It has to be -- there can't be anything there. And he said, thank you. And that's all I said to him.

page 5

LAW OFFICES
ROBERT A. SPA
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

14. On April 6, 2012, Ms. Shanklin came into my office and closed the door. Ms. Shanklin stated that she wanted me to submit my resignation. I was completely shocked at this request. I asked Ms. Shanklin why she wanted my resignation. Ms. Shanklin told me that I had allegedly breached confidentiality by telling Leveerne Smith, another employee, that his friend had a DWI on his criminal record. I tried to explain to Ms. Shanklin what had happened. Ms. Shanklin did not want to hear my explanation and instead stopped me and told me that it would look better on a job application if I resigned rather than be terminated. Ms. Shanklin told me that if I did not agree to resign, that she would call the State Troopers and have them escort me out of the building and terminate my employment.

15. I considered my options for several moments and decided that I had no other choice but to resign. I asked Ms. Shanklin what I could do to keep my job, she replied "nothing, you are done." I told Ms. Shanklin that I would resign, in lieu of being terminated and being escorted out of the building by the State Troopers. I turned to my computer to write a letter of resignation and discovered that ms. Shanklin had already had me locked out of the computer system. I was allowed to access the word processing program and wrote a short letter of resignation, signed it and handed it to Ms. Shanklin. Ms. Shanklin told me that I could not take my personal property with me. Ms. Shanklin

page 6

told me that I could return over the weekend to pick up my personal property.

16. Contrary to Ms. Shanklin's statement in paragraph 3 of her affidavit that "when asked about FMLA, FLSA, EEOC and other basic standard HR-related laws, Ms. Hunter did not know what the applicable legal standards were[,]" Ms. Shanklin and I did not have any discussions about the legal standards for any FMLA, FLSA, EEOC or other basic standard HR-related laws. I had originally applied for a receptionist/front desk position. I was asked if I was interested in an HR tech position and then I was told that I was being hired for the HR Supervisor position. I received a performance evaluation after my first six months of work that stated that I was doing a great job and was working hard. No one told me that there was any problem with my work performance.

17. The incident allegedly involving Kim Nadeau related in paragraph 4 of Ms. Shanklin's affidavit is completely false. I did not disclose any confidential salary information to Ms. Nadeau (or anyone else) and I certainly did not threaten Ms. Nadeau. I was not counseled by Ms. Shanklin or by anyone else for this alleged incident. Reviewing the performance evaluation document prepared by Ms. Shanklin shows that it was prepared approximately 3 days prior to this supposed incident on September 29, 2011. My evaluation date was October 27, 2012, so I was

page 7

released from my probation approximately one month early. I assume that if this incident had actually occurred that I could have at least been required to serve the remaining month of my probation or some written document would have been prepared by someone.

18. My performance evaluation does not state that I did anything wrong or that I needed to change the way that I did my job or the way that I handled confidential information. My performance evaluation did not state that I lacked any essential knowledge to perform my job duties. It was my understanding from speaking with Ms. Shanklin and other managers at FCBHC, that I was performing my duties in a satisfactory manner

19. The statement in paragraph 6 of Ms. Shanklin's affidavit that "there were multiple problems with Ms. Hunter's work performance. These problems grew worse after Ms. Hunter was evaluated[,]" is completely false. Ms. Shanklin never addressed any alleged problem with my work performance with me in any way, prior to the day that she demanded my resignation.

20. I was never told during my employment with the FCBHC by Ms. Shanklin or anyone else, that it was my responsibility to prepare any EEO-1 reports. The EEO-1 report dated November 23, 2011, attached to the Defendant's motion states that it was prepared by another employee named Brandy Simington. Ms. Simington was the Chief Financial Officer for FCBHC at the time

page 8

of the report. Ms. Simington is on the report both as the person who prepared the report and the person to whom any questions should be directed. I had no involvement of any kind in the preparation of the EEO-1 report dated November 23, 2011.

21. The statement by Ms. Shanklin that "Ms. Hunter communicated with insurance companies in an unprofessional manner by placing yellow sticky notes on legal and medical records. Some employees were left off insurance as a result[,]" is completely false. I did not "communicate with insurance companies in an unprofessional manner" by "placing yellow sticky notes on legal and medical records" I communicated with insurance companies via telephone, on-line and via email. It would be difficult to place a yellow sticky note on an email to an insurance company. There were no employees ever left off of the insurance. I would have expected to have been subjected to some type of disciplinary action or at least written up in some manner if I had left an employee who was supposed to be on the FCBHC's insurance policy off of the insurance coverage.

22. The statement by Ms. Shanklin that "Ms. Hunter failed to exercise appropriate supervisory skills when employees had concerns about another employee's personal hygiene[,]" is completely false. I was asked to speak with an employee whose clothes smelled like cat urine (this is no joke, it did happen). I did address this very sensitive issue with the employee in a

page 9

LAW OFFICES
ROBERT A. SPA
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

tactful manner as possible under the circumstances.

23. The statement by Ms. Shanklin that "Ms. Hunter dressed unprofessionally and failed to project an image of an HR professional. She wore hooded sweatshirts to work[,]" is also completely false. I was frequently complimented by my co-workers about my choice of clothing at work. Contrary to Ms. Shanklin's comment, I did not usually wear hooded sweatshirts while I was at work. I even helped to revise and re-circulate the dress code among the staff at the FCBHC during my employment, because staff members had begun wearing blue jeans to work regularly.

24. The statement by Ms. Shanklin that "Ms. Hunter's office was disorganized and cluttered[,] while partially true, was not competely my fault. As noted above, Ms. Shanklin decided to consolidate my office and two file storage rooms into one smaller office and there was not enough room for all of the file cabinets, furniture and boxes of records. The boxes of records had been collected during prior years before I was employed by FCBHC. While I tried to organize these materials as much as possible, with the extremely high turnover of employees at the FCBHC and the work load that I had, it was quite a challenge. FCBHC refused to hire another HR Tech after Ms. Hutchinson resigned immediately after I began working for FCBHC.

25. The statement by Ms. Shanklin that "Ms. Hunter complained to staff that she was one of the lowest paid

page 10

LAW OFFICES
ROBERT A. SPARKS
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

supervisors" is false. I never complained to the staff that I was the lowest paid supervisor.

26. The statement by Ms. Shanklin that "when counseled, Ms. Hunter resisted constructive criticism.' is completely false. Ms. Shanklin never counseled me about any problems with my work performance. I wanted to meet with Ms. Shanklin during 2012, prior to our meeting where she demanded my resignation, but she kept cancelling the appointments or Ms. Shanklin would just fail to show up or attend at the appointed times when we had agreed to meet.

27. The statement by Ms. Shanklin that I supposedly "would interrupt others and become argumentative[,] is also completely false. I was a good listener and I learned a lot from what people were saying or telling me. Please see my evaluation prepared by Ms. Shanklin which is directly contrary to her affidavit comments.

28. The statement by Ms. Shanklin that "Ms. Hunter failed to prepare for CPR training that she had volunteered to provide[,] is also completely false. I obtained my certification in May 2011, shortly after I was hired. See exhibit "A" Instructor Certification. I conducted a CPR class monthly or every six weeks during my employment with FCBHC. I certified at least 100 people through the CPR classes that I conducted. I took this responsibility seriously and I prepared diligently to

page 11

teach these classes.

29. The statement by Ms. Shanklin that "Ms. Hunter failed to document I-9 eligibility for employees[,] is completely false. I was very diligent in completing this task for newly hired employees. Unfortunately, the employee turnover at the FCBHC was extremely high at the time that I worked there and the FCBHC was in desperate need of warm bodies to fill positions. Consequently, employees were frequently placed into positions by management and allowed to begin work, before I was even given a chance to complete the eligibility screening process. I would request documentation from employees and their supervisors to complete I-9 eligibility documentation and I would not receive any response. I would let Ms. Shanklin know about the difficulty that I was having obtaining the documentation, but she did not indicate to me that she believed that this was a serious problem. I tried to meet with Ms. Shanklin about these issues, and she refused to attend the meetings or would reschedule and the meetings never occurred.

30. The statement by Ms. Shanklin that "Ms. Hunter failed to complete orientation and new hire packets[,] is completely false. I did complete orientation and new hire packets to the extent that I was able to do so for new employees. The problem that I experienced was that with the high employee turnover at the FCBHC and the need for new employees to fill existing

page 12

positions, that management would frequently allow new employees to begin work, without requiring the employees to complete the orientation process. Consequently, frequently the employees would not provide me with the documents that I needed. As discussed above, I would inform the employee and their supervisors that I needed additional information and documents and I occasionally I would not receive any response. I kept Ms. Shanklin aware of these problems and she never indicated to me that she believed that it was a serious problem or that I should do anything differently to obtain the information.

31. The statement by Ms. Shanklin that "Ms. Hunter failed to timely post advertisements for new job openings" is also false. I would receive communications from managers about new positions that were available. I would usually have the jobs advertised by the end of the same day that I received the notice of the vacancy. Ms. Shanklin, nor any other management employee of the FCBHC, ever informed me that I had not posted a vacant position in a timely manner, after I was informed of the vacancy.

32. The statement by Ms. Shanklin that "Ms. Hunter violated recordkeeping requirements under state and federal law by shredding employee files for recently terminated employees" is also completely false. I never shredded any employee files. I was told by Ms. Shanklin to shred duplicate copies of employment applications  It was my understanding from speaking

page 13

to Ms. Shanklin that the employment applications that I was asked to shred by her were duplicate copies of the applications that had been copied for use during applicant interviews and were more than 3 years old. If the person had been hired by FCBHC, I made sure that there was a copy of the application in the employee's files and shredded the duplicate applications. I did not shred any employee files for any present or past employees of FCBHC.

33. I was asked by Ms. Shanklin to set up safety meetings for the FCBHC. She did not inform me that I needed to prepare minutes for the meetings or that the meetings were related to any licensing or regulatory requirement. We held safety meetings approximately every quarter. Ms. Shanklin failed to attend any of the safety meetings. No one who attended the safety meetings had any idea as to what the goal or the purpose of the meetings were. The safety meeting committee tried to address safety issues that we were aware of or that were apparent to us. I have attached as Exhibit "B" a print out of a search for the Commission on Accreditation of Rehabilitation Facilities (CARP). This print out does not show any current certification by CARP for the FCBHC.

34. The statement by Ms. Shanklin that "Ms. Hunter failed to properly file personnel files[,] is completely false. I maintained the personnel files for existing and former FCBHC employees during my employment in a proper and organized fashion.

page 14

35. The statement by Ms. Shanklin that "Ms. Hunter also failed to complete reports or projects required by law or policy such as the Occupational Safety Employment report, workers compensation reports and others[,] is completely false. I was never told by anyone that it was my responsibility to prepare the Occupational Safety Employment or workers compensation reports. It was my understanding that the persons in the payroll department were responsible for preparing and submitting these reports. I was employed by the FCBHC for nearly a year, you would think that at sometime during this time period if there was some critical report that I was responsible for preparing that had not been filed, that someone would have sent me an email or documented in some way that I was responsible for preparing the report. Ms. Shanklin repeatedly advised the supervisors and managers to document employee performance and she frequently stated that "if it is not in writing it did not happen."

36. The statement by Ms. Shanklin that "Ms. Hunter improperly transferred confidential employee information (such as social security numbers, maiden names, and dates of birth) to a thumb drive, and then took that home with her[,]" is also false. I used my thumb-drive to backup information on my work computer. The thumb-drive was left in my drawer at the FCBHC and I did not take it home with me. I was never told that backing up my work information on the thumb drive was a problem of any

page 15

LAW OFFICES
ROBERT A. SPA
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

kind. My computer crashed during my employment with FCBHC and I would have lost a large amount of my work if I had not had backups of the data.

37. Contrary to Ms. Shanklin's statements in paragraph 8 of her paragraph, I did not disrespect any of my co-workers. I did not call the Executive Director's Executive Assistant a "narc". I did not tell other employees that the CFO was a "control freak". I did not call the manger of Rehabilitative Services a "Sheriff" or any other names behind her back.

38. Ms. Shanklin's statement in paragraph 9 of her affidavit that she supposedly "informally counseled" me throughout my employment concerning alleged "problems" is completely false. Ms. Shanklin and I did not discuss my work performance. Even when Ms. Shanklin provided me with my performance evaluation during September of 2011, she did not discuss my work performance with me. Ms. Shanklin handed me my performance evaluation, asked me if I had any questions, I read the form and told her I did not have any questions and she told me that I was doing a good job. Ms. Shanklin then stated to me that I should keep my door closed, because my voice carried and I said ok. No one ever told me that there was any problem of any kind with my work performance, until Ms. Shanklin demanded my resignation.

39. Ms. Shanklin did not conduct any oral counseling

page 16

session with me in February 2012, as she claims in paragraph 9 of her affidavit.

40. When I was informed by Ms. Shanklin that my choice was to resign or be terminated for cause and escorted out of the building by the State Troopers, it was not my understanding that I had any option to appeal or file a grievance with anyone concerning the termination of my employment, except with Ms. Shanklin. Since Ms. Shanklin had just stated to me that she intended to terminate my employment and have the State Troopers escort me out of the FCBHC building, if I refused to resign, I did not feel that filing a grievance with Ms. Shanklin was a viable option to contest her termination of my employment.

41. The documents produced by Defendant show that Mr. Michael Bittorf was hired to work for FCBHC for $17.00 per hour. Mr. Bittorf was not on a salary, he was hourly, so he would have been entitled to be paid overtime for work that I was not compensated for except for my salary. I was paid a salary of $36,400 per year, which was based on 40 hours per week for 52 weeks per year = 2080 hours per year, or $17.50 per hour. Based my salary, Mr. Bittorf would have only made approximately $1,040 per year less than I was paid. I frequently worked 3 - 5 additional hours per week, due to the high employee turnover at the FCBHC. In essence, I earned less than Mr. Bittorf, because if he was required to work over 8 hours in a day or over 40 hours

page 17

a week, he was entitled to be paid over time and I was not.

42. During my employment with the FCBHC, I attended most of the interviews that were conducted by other FCBHC managers when they were interviewing applicants for open positions. It is my understanding that Mr. Bittorf applied for an HR job with the FCBHC during March 2012. I did not ever see Mr. Bittorf's application for employment, although I was the HR Supervisor at the time he would have submitted an application. It would have been very unusual for Mr. Bittorf to have applied for a position in the HR department and I did not receive the application submitted by Mr. Bittorf and was not aware of it. A friend of mine who was working at the FCBHC gave me the document attached hereto as Exhibit "C" which appears to be a page from a hiring package from the FCBHC showing that Mr. Bittorf applied for an HR position on March 12, 2012. See Exhibit "C" Affirmative Action Program Voluntary Information Form. I know from my experience working for defendant that Exhibit "C" Affirmative Action Program Voluntary Information Form is a page that is contained in the hiring package that new applicants for employment are asked to fill out by the Defendants HR office. It would have been very unusual for Mr. Bittorf to have applied for employment at the FCBHC during March 2012 and me not being informed of the submission of his application.

43. During a typical day at the HR office for FCBHC I would

page 18

LAW OFFICES
ROBERT A. SPA
ATTORNEY AT LAW
1552 NOBLE STREET
FAIRBANKS, ALASKA 99701
PH: (907) 451-0875
FAX: (907) 451-9385

be involved in conducting background checks, attending interviews, performing new employee orientations, completing new hire packets, posting job vacancies with the Alaska department of labor, filing documents, emailing insurance companies to add new employees to the insurance and taking terminated employees off the insurance, opened all the HR department mail, resolved disputes between employees.

44. Attached hereto as Exhibit "D" is a true and correct copy of a page from the Defendant's webpage, http://www.fcbhc.org, that I viewed and printed on April 24, 2012, showing that Michael Bittorf was hired as Defendant's "Human Resources Supervisor."

**End of Affidavit.**

Dated this 12th day of August, 2013, at Fairbanks, Alaska.

_Donna M. Hunter_

SUBSCRIBED AND SWORN TO before me this _12_ day of August, 2013.

Notary Public in and for Alaska
My Commission Expires: _1-25-16_



NOTARY PUBLIC
CAROLYN J. SPARKS
STATE OF ALASKA

page 19